THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JORGE MAÑAY, ELIZABETH ALTAMIRANO, and INTERNATIONAL TRAVELLERS ASSISTANCE,<br><br>Plaintiffs,<br><br>v.<br><br>ACADEMIC EXCHANGE OF AMERICA, a Washington nonprofit corporation; and ERIC CARLSON and JANE DOE CARLSON, individually and the martial community composed thereof,<br><br>Defendants. | NO. C07-5071 RBL<br><br>ORDER ON DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter is before the Court on the defendants' motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment. For the reasons set forth below, the Court grants partial summary judgment as to plaintiffs' claims for negligent misrepresentation and tortious interference. The Court denies the motion in all other respects.

## II. BACKGROUND

Plaintiffs Jorge Mañay and Elizabeth Altamirano are residents of Equador. Through their business, International Travellers[1] Assistance ("ITA"), Mr. Mañay and Ms. Altamirano help facilitate placement of

---

[1] This irregular spelling of the English word "travelers" is found throughout plaintiffs' submissions.

ORDER
Page - 1

foreign exchange students in the United States and other countries. Defendant Academic Exchange of America ("AEA") is a non-profit corporation formed under the laws of the State of Washington, and defendant Eric Carlson is AEA's chief officer. AEA is in the business of facilitating public high school exchange programs here in the United States under the Mutual Education and Cultural Exchange Act of 1961.

Mr. Carlson first contacted Mr. Mañay in early 2005, and the parties began negotiating the terms of an agreement whereby the two would work together to facilitate placement of Ecuadoran exchange students here in the United States. Mañay wanted to place students in the Fall 2005 program, leaving a relatively short time frame to secure placements and process paperwork. Nevertheless, Mañay claims that Carlson guaranteed placement of up to twenty students if they were enrolled before July 1. [Mañay Declaration, Dkt. #38, p. 2] Then, on June 5, 2005, the parties entered into a written agreement.[2]

Generally, that agreement provided that AEA was to find a host family for each accepted student; provide the visiting student with the host family's name, address, and telephone number before the student left Equador; supply each student with a DS-2019 form that would allow the student to procure a student visa; secure enrollment for each students in a public or private high school; and procure medical insurance for all students. In return, ITA was to pay fees to AEA ($3,600 per student for a two-semester program); interview all applicants to confirm the adequacy of their English skills; complete application forms for all applicants and send those forms to AEA before July 31, 2005 (for August arrivals); provide each applicant with an open round-trip airline ticket between Equador and the airport nearest the host family; and send complete flight information for all applicants to AEA at least two weeks prior to the date of arrival in the United States. In addition, ITA agreed not to send any student to the United States without written confirmed placement from AEA. [Carlson Declaration, Dkt. #22, pp. 10-12]

Mañay subsequently located twelve students who wished to enroll in the program, and all twelve were accepted by AEA through letters signed by Carlson. [Mañay Declaration, Dkt. #38, p. 2] ITA then paid deposits for these students by wiring $3,000 to Eric Carlson. In July 2005, Carlson traveled to Ecuador to meet with Mañay and conduct an orientation session for the exchange students and their

---

[2] While the parties seem to agree that this document was signed on June 5, 2005, the copy of the agreement filed with the Court is dated July 27, 2007. [Dkt. #22, p. 10] Neither party attempts to explain this discrepancy.

families. At that session, plaintiffs claim that Carlson again guaranteed placements by the end of July for all accepted students. [Mañay Declaration, Dkt. #38, pp. 2-3] Carlson does not directly refute this allegation, but claims he promised refunds or deferred placements to those not placed in the Fall 2005 program. [Carlson Declaration, Dkt. #22, p. 5]

On August 2, 2005, Mañay explained to Carlson that final payment could be made as soon as AEA provided information about the host families. Carlson indicated that he was waiting for the host families to finalize their decisions, but that he would require full payment of the additional $40,200 in program fees before he could deliver the students' DS-2019 visa forms:

> Dear Jorge,
>
> I hope this email finds you doing well.
>
> I wanted to let you know I have a number of placements "waiting" to happen for your students. At this time I am "waiting" for the host families to make up their minds. As soon as I have those final decisions, we will be able to send you the final placements.
>
> Meanwhile, I need to send you the DS-2019 forms, however I can't do that until I have received the full payment of program fees. Since we spoke last weekend, I am expecting the payment this week via bank wire. Would you please confirm that the payment has been sent.
>
> Thank you very much for your quick reply.
>
> Best regards,
>
> Eric Carlson

[Mañay Declaration, Dkt. #38, Ex. D]

In response, Mañay forwarded an additional $22,200 to AEA's account. Also around this time, all twelve students booked flights from Equador to the United States. Then, on August 18, 2005, Carlson sent Mañay a list of twelve host families here in the United States. The list included the names and addresses of the families, but did not included phone numbers. It appears that these names were used by all twelve students at the United States Embassy to successfully procure their student visas.

The next day, Carlson informed Mañay that there would be some changes in the host families in the coming week and that the list which had been provided was just for the embassy. [Mañay Declaration, Dkt. #38, Ex. K] Carlson asserts that it is typical to send lists of non-permanent "arrival" families to the agent in order to facilitate visa issuance, but Mañay claims this was the first time he was informed that the list of families was not final. He also claims that Carlson continued to assure him that all twelve students would

ORDER
Page - 3

be placed. On this assurance, Mañay wired the final payment of $18,000 to AEA.

Then, on August 31, 2005, Carlson informed Mañay that he had secured school and host family placements for only three of the twelve accepted students and that the other nine would have to remain in Equador until further notice. [Mañay Declaration, Dkt. #38, Ex. M] What happened next is not entirely clear, but it appears that Mañay and some of the then-unplaced students traveled to the United States in the hopes of finalizing host families and schools once they had arrived. Mañay claims this was done because plane tickets had already been purchased and because Carlson continued to assure those involved that he would finalize placements for some of the remaining students. Carlson claims that their travel to the United States was a violation of federal law which prevented him from further assisting them in their search for placements.[3] Carlson also claims that this act divested the plaintiffs of their right to any refund of program fees.

In the end, it appears that AEA provided effective and relatively problem-free placements for only five of the twelve accepted students. Of the remaining seven, three students (Xavier Miño, Danilo Gamboa, and Luis Carlos Arias) were never placed with host families in the United States. These students brought successful lawsuits against Jorge Mañay and ITA in Equador. [Mañay Declaration, Dkt. #38, p. 7] AEA also failed to place a fourth student, Gabriel Cubas, but Mañay eventually located a placement for this student on his own at an additional cost of $500 per month. [*Id.*]

Three other students *were* placed by AEA, but experienced problems. One of these students, Karlha Echeverría, was placed with a host family that did not "meet her needs," and she was forced to return to Equador. [*Id.*] AEA also located a host family for Lorena Bayas, but enrolled her in a private school which required additional tuition payments. When these payments were not made, she was forced to change schools in the middle of the academic year. Yet another student, Estefanía Cedillo Granja, appears to have been placed successfully, but alleges AEA failed to obtain an insurance policy for her. [*Id.*, p. 8]

After unsuccessful attempts to recover their money from AEA and Carlson, plaintiffs filed this

---

[3] Sponsors such as AEA are prohibited from facilitating the entry into the United States of any student for whom school and family placements have not been secured. 22 C.F.R. § 62.25(f)(4) (2005) (schools); 22 C.F.R. § 62.25(l)(1)(i) (2005) (families).

ORDER
Page - 4

lawsuit, alleging breach of contract, unjust enrichment, breach of fiduciary duty, tortious interference with prospective business relations, fraud, negligent misrepresentation, constructive trust, and violation of Washington's Consumer Protection Act. Defendants now move the Court to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment. Plaintiffs have responded on the merits, but also request a continuance to pursue additional discovery.

### III. DISCUSSION

**A.     Subject Matter Jurisdiction**

In a civil action with complete diversity of citizenship between the parties, the Court has subject matter jurisdiction so long as the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332; *Crum v. Circus Circus Enterprises*, 231 F.3d 1129, 1331 (9th Cir. 2000). The sum claimed by the plaintiff in her complaint controls, provided that sum is claimed in good faith. *Id.* In fact, the district court should dismiss a complaint only if it appears "to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938); *Crum*, 231 F.3d 1331. "Events occurring after the filing of the complaint that reduce the amount recoverable below the requisite amount do not oust the court from jurisdiction." *Budget Rent-A-Car, Inc. v. Higashiguchi*, 109 F.3d 1471, 1473 (9th Cir. 1997); *see also St. Paul Mercury*, 303 U.S. at 293.

Here, the plaintiffs' operative complaint contains eight causes of action, including claims for breach of contract, fraud, tortious interference, and violation of Washington's Consumer Protection Act, RCW 19.86. Plaintiffs claim $417,612.29 in damages, including incidental damages of $19,712, lost profits in excess of $320,000, and claims for indemnification of $77,900.[4] This amount is sufficient to satisfy the jurisdictional requirement and appears to have been made in good faith. Defendants' motion to dismiss for lack of subject matter jurisdiction is therefore DENIED.

**B.     Rule 56(f) Continuance**

When a party opposing a motion for summary judgment identifies specific reasons why it cannot

---

[4] Plaintiffs state that they became liable in this amount "to the students who were not placed and could not find placement for the academic year of 2005/2006, and who had filed lawsuits against them in Equador, which included refund of exchange program fees paid to AEA and of damages caused to the students." [Plaintiffs' Second Amended Complaint, Dkt. #26, p. 7] While plaintiffs do not label this item of damage as a claim for indemnification, it is one. *See Central Washington Refrigeration, Inc. v. Barbee*, 133 Wn.2d 509, 513, 946 P.2d 760 (1997) (a claim for implied contractual indemnity arises when one party incurs a liability the other party should rightfully discharge).

present those facts essential to justify its opposition, the Court may deny the motion for summary judgment, order a continuance, or grant other relief. Fed. R. Civ. P. 56(f). However, the "party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

In the instant case, the plaintiffs have requested relief under Fed. R. Civ. P. 56(f), but have failed to identify any specific facts they hope to reveal through further discovery.[5] See *Tatum*, 441 F.3d at 1100 (continuance properly denied where counsel's declaration supporting such relief mentioned outstanding discovery, but failed to identify "specific facts" sought or to explain why information was essential to opposition). Plaintiffs' motion for a continuance is therefore DENIED.

**C.     Summary Judgment**

Summary judgment is appropriate when the record shows that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *U.S. v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990). When a properly supported motion for summary judgment is made, the burden then shifts and the opposing party must then set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. Put another way, summary judgment should be granted where the non-moving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. *Id*. at 252. When viewing the evidence at this stage, all justifiable inferences are drawn in favor of the non-moving party. *Id*. at 255.

**1.     Defendants have not met their initial burden of showing that Mr. Carlson should be dismissed in his personal capacity.**

Relying on RCW 4.24.264, defendants seek to have Eric Carlson dismissed in his "personal capacity." That statute, however, only protects Mr. Carlson for acts within his "official capacity as a board

---

[5] The issue is addressed by plaintiffs' counsel only as follows: "The deposition testimony of defendant Eric Carlson whose deposition is noted for March 27, 2008, will likely support plaintiffs' opposition to defendants' Motion for Summary Judgment." [Declaration of Nadja Vietz, Dkt. #37, p. 3] Such a general statement, without more, does not satisfy the plain requirements of Fed. R. Civ. P. 56(f); it is not for the Court to speculate as to what Mr. Carlson's testimony might be or how that testimony might support plaintiffs' claims.

member." *See Barry v. Johns*, 82 Wn. App. 865, 869, 920 P.2d 222 (1996). Here, the defendants offer no evidence suggesting that all of Mr. Carlson's acts were committed within his official capacity as a board member.

To illustrate, the defendants have not shown that Mr. Carlson is individually immune from liability for the acts alleged in plaintiffs' operative complaint, including fraud and conversion. *See, e.g., Johnson v. Harrigan-Peach Land Development Co.*, 79 Wn.2d 745, 752-54, 489 P.2d 923 (1971) (officer of a corporation is liable for a tort committed in the course and within the scope of his official duties to the corporation). Moreover, defendants have not produced any evidence showing why Mr. Carlson should not be held personally liable for AEA's debts under the theory of "corporate disregard," also known as "piercing the corporate veil." *See, e.g., Morgan v. Burks*, 93 Wn.2d 580, 585, 611 P.2d 751 (1980) (corporate entity is disregarded when corporation has been intentionally used to violate or evade a duty owed to another, such as where corporation and its controllers are "alter egos" or where corporation has been "gutted" and left insolvent to defraud creditors); *see also Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 409-11, 645 P.2d 689 (1982). Defendants' motion for summary judgment as to claims against Eric Carlson is therefore DENIED.

**2.    There are genuine issues of fact regarding plaintiffs' claims for breach of contract.**

"Generally, a plaintiff in a contract action must prove a valid contract between the parties, breach, and resulting damage." *Lehrer v. State, Dept. of Social and Health Services*, 101 Wn. App. 509, 516, 5 P.3d 722 (2000). However, performance of an otherwise valid contract may be excused under the doctrine of impossibility "where performance is impossible or impracticable due to extreme and unreasonable difficulty, expense, injury or loss." *Metropolitan Park Dist. of Tacoma v. Griffith*, 106 Wn.2d 425, 439, 723 P.2d 1093 (1986). The promisor may avoid performance under the doctrine of impossibility only when the event which renders performance impossible could not have been avoided by the promisor. *Id*. at 440. Where performance is rendered impossible by an event which the defendant could have avoided, the defense of impossibility is unavailable. *Thornton v. Interstate Securities Co.*, 35 Wn. App. 19, 31, 666 P.2d 370 (1983).

Neither party here appears to dispute the existence of a valid and enforceable contract, but the defendants claim that plaintiffs breached the contract by bringing unplaced students into the United States. Further, defendants argue that this breach by the plaintiffs rendered their own contractual performance

impossible. In response, plaintiffs claim that it was the defendants who breached first by failing to find placements, as promised, for all students accepted to the program.

This dispute presents genuine issues of material fact. According to the plain terms of the contract, AEA was to provide a host family for each accepted student. [Carlson Declaration, Dkt. #22, p. 11] And the defendants do not contest that at least some of the students accepted to the program were not placed. Thus, viewing the facts in the light most favorable to the non-moving plaintiffs, a reasonable jury could conclude that there was a valid and enforceable contract wherein the defendants guaranteed placements for all students accepted to the program, that the defendants breached the contract, and that the plaintiffs incurred damages as a result.

The contractual defense of impossibility is inapplicable here, and the defendants' argument to the contrary begs the question. Defendants claim it was impossible to facilitate entry into the United States for those students who had not been placed because federal law forbid them from doing so; but this line of reasoning assumes that the defendants had no obligation to secure placements for those students *prior* to their arrival, an obligation which is averred by the plaintiffs' and which underlies their claims for breach of contract. Because the defendants' performance was not rendered impossible by an unavoidable event, but rather by its own failure to secure advanced placements for all accepted students, the defense of impossibility is unavailable to them. *See Thornton*, 35 Wn. App. at 31. Defendants' motion for summary judgment on the breach of contract claims is therefore DENIED.

**3.     There are genuine issues of fact regarding plaintiffs' claims for conversion.**

"A conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Pub. Util. Dist. No. 1 of Lewis County v. Washington Pub. Power Supply Sys.*, 104 Wn.2d 353, 378, 705 P.2d 1195 (1985). It is irrelevant whether the defendant acted in good faith when committing the tort of conversion. *In re Marriage of Langham and Kolde*, 153 Wn.2d 553, 560, 106 P.3d 212 (2005).

Because a reasonable jury could find that defendant AEA breached its contract by failing to provide placements for all students accepted to the program, a reasonable jury could also find that the defendants were obligated to return those program fees paid by the unplaced students and that defendants thereby deprived plaintiffs of those funds without lawful justification. Defendants' motion for summary judgment on plaintiffs' conversion claims is therefore DENIED.

**4.     There are genuine issues of fact regarding plaintiffs' claims for fraud.**

"The nine elements of fraud are: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).

Defendants challenge the existence of the first element, representation of an existing fact. They claim that even if Mr. Carlson represented his ability to place all accepted students, this was merely a promise of future performance, which cannot support an allegation of fraud. It is true that where the statement in question is merely a promise of future performance, and not a representation of existing fact, the first element of a fraud claim is lacking. *See id.* at 505-06; *Nyquist v. Foster*, 44 Wn.2d 465, 469-70, 268 P.2d 442 (1954). "Where the fulfillment or satisfaction of the thing represented depends upon a promised performance of a future act, or upon the occurrence of a future event, . . . then the representation is not of an existing fact." *Id.* at 471. On the other hand, a promise made for the purpose of deceiving and with no intention to perform will support a claim for fraud. *Markov v. ABC Transfer & Storage Co.*, 76 Wn.2d 388, 396, 457 P.2d 535 (1969).

Viewing the facts in the light most favorable to the non-moving plaintiffs, a reasonable jury could find that Mr. Carlson promised to place all the students he accepted to the program [Mañay Declaration, Dkt. #38, p. 2], but that he had no intention of doing so. Such an inference might be supported by Mr. Carlson's alleged history of promising to place students, taking fees, failing to place those students, and then denying refunds. [Wheeler Declaration, Dkt. #35] A reasonable jury could also conclude that Mr. Carlson made a knowingly false statement of an existing fact after the contract was formed, but prior to receiving full payment. On August 19, 2005, Mr. Carlson indicated via e-mail, "We have finished matching host families with your students." [Mañay Declaration, Ex. J, Dkt. #38] Presumably relying on this e-mail and the list of host families contained therein, the students proceeded with their embassy appointments and Mr. Mañay forwarded the last payment, an additional $18,000, to Mr. Carlson at AEA. [*Id.*, p. 4] Only after he had accepted payment for all twelve students did Mr. Carlson admit that he could not place them all. [*Id.*] Thus, a reasonable jury could conclude that Mr. Carlson made a knowingly false statement of then-existing fact when he asserted that AEA had "finished matching host families." These are genuine

1  issues of fact that cannot properly be decided by the Court. Defendants' motion for summary judgment on
2  plaintiffs' fraud claims is therefore DENIED.[6]

### 5. Plaintiffs' negligent misrepresentation claims are barred by the economic loss rule.

By prohibiting plaintiffs from recovering contract losses in tort, the economic loss rule "maintains the fundamental boundaries of tort and contract law." *Alejandre v. Bull*, 159 Wn.2d 674, 682, 153 P.3d 864 (2007). Where the rule applies, the plaintiff will be held to contract remedies, no matter how she characterizes her claims. *Id.* at 683. Thus, while Washington recognizes a tort claim for negligent misrepresentation, recovery under that theory is barred when the parties have contracted against the risk of loss or when they *should have* contracted against the risk of loss. *Id.* at 686-88. However, the economic loss rule does *not* preclude claims for fraud. *Id.* at 689.

Plaintiffs attempt to salvage their claims for negligent misrepresentation by pointing out that the only contractual relationship in play is between plaintiffs and AEA, not Mr. Carlson individually. Thus, they claim, the economic loss rule does not impact their claims against Mr. Carlson, only their claims against AEA. The Court has not located direct authority foreclosing this novel argument, and none was supplied by the defendants. Nevertheless, the argument must fail; were the rule otherwise, employers would remain liable under principles of respondeat superior for negligent misrepresentations made by their employees during contract negotiations, and the economic loss rule would be eviscerated. *Cf. Berschauer/Phillips Const. Co. v. Seattle School Dist. No. 1*, 124 Wn.2d 816, 827-28, 881 P.2d 986 (1994) (even absent privity of contract, negligent representation claims by general contractor against design professional for economic damages were barred by economic loss rule). Defendants' motion for summary judgment on plaintiffs' claims for negligent misrepresentation is therefore GRANTED.

### 6. Defendants have not met their initial burden of showing that consequential damages are unavailable.

"Contract damages are ordinarily based on the injured party's expectation interest and are intended

---

[6] Although the issue is before the Court on defendant's motion for summary judgment, this section of the defendants' moving brief is titled so as to suggests a challenge to the adequacy of plaintiffs' pleadings. *See* Fed. R. Civ. P. 9(b) ("party must state with particularity the circumstances constituting fraud or mistake"); Charles Alan Wright & Arthur R. Miller, 5A Federal Practice & Procedure § 1300 (3d ed. 2004) (discussing various mechanisms for enforcement of Rule 9(b)'s particularity requirement). While the Court finds that genuine issues of fact exist, precluding summary judgment, no comment on the sufficiency of the pleadings is intended or should be inferred.

1  to give that party the benefit of the bargain by awarding him or her a sum of money that will, to the extent
2  possible, put the injured party in as good a position as that party would have been in had the contract been
3  performed." *Mason v. Mortgage America, Inc.*, 114 Wn.2d 842, 849, 792 P.2d 142 (1990). But the
4  recovery of damages may be limited by forseeability, i.e. damages may be limited to those which arise
5  naturally from the breach itself and which "may reasonably be supposed to have been in the contemplation
6  of both parties, at the time they made the contract, as the probable result of the breach of it." *Hadley v.
7  Baxendale*, 9 Ex. 341, 354, 156 Eng.Rep. 145, 151 (1854); *Dally v. Isaacson*, 40 Wn.2d 574, 578, 245
8  P.2d 200 (1952). In line with this rule, "lost profits are properly recoverable as damages when (1) they are
9  within the contemplation of the parties at the time the contract was entered, (2) they are the proximate
10 result of defendant's breach, and (3) they are proven with reasonable certainty." *Tiegs v. Watts*, 135
11 Wn.2d 1, 17, 954 P.2d 877 (1998). "Mathematical exactness is not required." *Mason*, 114 Wn.2d at 850.

12 Defendants make various arguments that "lost profits and other consequential damages" are
13 unavailable in this case, but they have not met their initial burden of showing which amounts (if any) would
14 be properly foreclosed as a matter of law.[7] Defendants suggest in their moving brief that these losses were
15 not contemplated by the parties to the agreement, but no evidence is supplied to support this proposition.
16 Problematically, the defendants also fail to supply evidence as to which portions of the total amount
17 claimed by the plaintiffs would be properly classified as "lost profits," "lost future profits," or "damage to
18 reputation." Defendants' motion for summary judgment regarding claims for "future lost profits and other
19 consequential damages" is therefore DENIED.

20 **7.    There is no issue of fact regarding plaintiffs' claims for tortious interference.**

21 One who induces or otherwise purposely causes a third person not to perform a contract with
22 another may be liable to the other for any harm caused to the other by the third person's non-performance.
23 *Calbom v. Knudtzon*, 65 Wn.2d 157, 162, 396 P.2d 148 (1964). "A claim for tortious interference with a
24 contractual relationship or business expectancy requires five elements: (1) the existence of a valid
25 contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3)

---

[7] Even if some amount were foreclosed as consequential damages beyond the contemplation of the parties, that amount might still be compensable under another theory of recovery. For example, a plaintiff who is successful on her fraud claims is generally entitled to recover damages for all losses proximately caused by the fraud. *See Salter v. Heiser*, 39 Wn.2d 826, 832, 239 P.2d 327 (1952); Buttnick v. Clothier, 43 Wn.2d 667, 673, 263 P.2d 26 (1953).

an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce County Medical Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). However, where a defendant's breach of contract happens to effect a plaintiff's business relationships with third parties, an action for tortious interference is not supported. *Cherberg v. Peoples National Bank of Washington*, 88 Wn.2d 595, 604, 564 P.2d 1137 (1977). The "distinguishing feature" is "whether the interference with business relations was a mere incidental consequence of the breach or a motive or purpose therefor." *Id*.

Upon inspection, it is clear to the Court that plaintiffs' tortious interference claims are truly claims for breach of contract and that no genuine issue of fact exists regarding their viability. A reasonable jury could very well find that the defendants breached their contract with the plaintiffs and that the defendants' breach left ITA unable to fulfill its own contractual obligations, but there is no evidence from which a reasonable jury could conclude that the defendants' *purpose* in breaching their contract was to achieve this secondary effect; rather, a reasonable jury would be forced to conclude that any interference with ITA's other contracts and prospective business relationships was "a mere incidental consequence" of the defendants' breach. *See Cherberg*, 88 Wn.2d at 604. Defendants' motion for summary judgment on plaintiffs' claims for tortious interference is therefore GRANTED.

## IV. CONCLUSION

Because the parties are diverse and the amount in controversy requirements satisfied, this Court has subject matter jurisdiction. Plaintiffs have not complied with the specificity requirements of Fed. R. Civ. P 56(f) and, as such, they are not entitled to a continuance. With regard to plaintiffs' claims against Mr. Carlson individually and against both defendants for consequential damages, defendants have failed to meet their initial burden of showing that no genuine issues of fact exist. However, plaintiffs' claims for negligent misrepresentation are barred by the economic loss rule, and no reasonable jury could find for the plaintiffs on their claims for tortious interference. All other claims addressed by the defendants in their motion for summary judgment present genuine issues of material fact for trial.[8]

---

[8] In their motion, defendants do not address plaintiffs' other claims, such as those for quantum meruit, unjust enrichment, and violation of Washington's Consumer Protection Act. Neither will the Court.

Therefore, IT IS HEREBY ORDERED,

(1) plaintiffs' motion for a continuance is DENIED;

(2) defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED;

(3) plaintiffs' claims for negligent misrepresentation and tortious interference are DISMISSED, with prejudice; and

(4) defendants' motion for summary judgment [Dkt. #21] is in all other respects DENIED.

DATED this 25th day of March, 2008.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE